O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDA E. G., <br> Plaintiff, <br> v. <br> ANDREW M. SAUL, Commissioner of Social Security, <br> Defendant. | Case No. 8:20-cv-01423 KES <br><br> MEMORANDUM OPINION AND ORDER |

## I.

## BACKGROUND

In March 2017, Rhonda E. G. ("Plaintiff") applied for Title II Social Security disability benefits alleging that she became unable to work fulltime on April 24, 2014, due to depression, anxiety, and stress-related physical disorders such as hypertension, insomnia, and incontinence.[1] Administrative Record ("AR") 173–74, 199, 212. In April 2014, she pursued a workers' compensation claim alleging that her supervisor had caused her poor mental health by subjecting her to harassment and unfair treatment. AR 320. On July 10, 2019, an Administrative Law Judge

---

[1] Plaintiff had some part-time earnings in 2015 and 2017 that did not rise to the level of substantial gainful activity. AR 17.

("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE"). AR 34–65.

On August 27, 2019, the ALJ issued an unfavorable decision. AR 15–28. The ALJ found that Plaintiff suffered from the severe, medically determinable impairments ("MDIs") of "major depressive disorder (MDD); generalized anxiety disorder (GAD); irritable bowel syndrome (IBS); and incontinence." AR 17. The ALJ found that Plaintiff's other MDIs, including gastroesophageal reflux disorder ("GERD"), eczema, alopecia, insomnia, bunions, and hypothyroidism, were not severe. AR 18–19. The ALJ also found that Plaintiff's mental impairments caused only mild or moderate functional limitations. AR 20. Accordingly, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform work at all exertional levels but with the following non-exertional limitations:

> [Plaintiff] is limited to performing simple, routine, repetitive tasks for periods of two hours at a time. Can perform low-stress work, which is defined as involving only occasional decision making and occasional changes in the work setting. Can have occasional contact with the public and coworkers. Can have occasional contact with supervisors after any initial training period. Cannot perform tandem tasks or work as part of a team. Must have ready access to a bathroom, meaning that a bathroom must be within a few minutes' walk.

AR 21.

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could no longer perform her past relevant work as a customer service representative, cashier, procurement clerk, administrative assistant, or audit clerk. AR 26–27. Plaintiff could, however, work as a garment folder (Dictionary of Occupational Titles ["DOT"] 789.687-066), seam presser (DOT 789.687-166), and

table worker (DOT 739.687-182) (collectively, the "Alternative Jobs").[2] AR 27–28. The ALJ concluded that Plaintiff was not disabled. AR 28.

## II.
## ISSUES PRESENTED

<u>Issue One</u>: Whether the ALJ erred in weighing the medical evidence to determine Plaintiff's RFC. (Dkt. 16, Joint Stipulation ["JS"] at 4.)

<u>Issue Two</u>: Whether the ALJ erred in evaluating (a) Plaintiff's subjective symptom testimony and (b) the lay statements of Plaintiff's mother. (Id.)

## III.
## DISCUSSION

**A.     ISSUE ONE: The ALJ's Evaluation of the Medical Evidence.**

The Court identified six distinct sub-issues in the Joint Stipulation and addresses each below. Plaintiff contends that the ALJ erred by (a) failing to accommodate Plaintiff's mild or moderate difficulties adhering to a schedule or give reasons for rejecting such opinions from the state agency consultants and consultative examiner; (b) violating the treating physician rule, 20 C.F.R. § 404.1527(c)(2), by rejecting the work restrictions of Robert S. Sanford, M.D., a urologist who evaluated Plaintiff for her workers' compensation claim; (c) failing to limit Plaintiff's use of her right hand due to tenosynovitis; (d) finding that Plaintiff's psychiatric symptoms, combined with her need for frequent bathroom breaks, would not cause her to be off-task more than 15% of the time; (e) attempting to accommodate Plaintiff's incontinence by restricting her to work "within a few minutes' walk" from a bathroom; and (f) failing to include any exertional limits in Plaintiff's RFC. (JS at 4–13.)

---

[2] The full DOT descriptions of these jobs are available at 1991 WL 681266 (garment folder), 1991 WL 681290 (seam presser), and 1991 WL 680217 (table worker). All of these positions require only reasoning level 1, the lowest reasoning level in the DOT.

3

### 1. Sub-Issue 1(a): Persistence-Related Opinions.

Plaintiff underwent a psychological consultative examination by Edward B. Keehn, Ph.D., Psy.D, on June 19, 2017. AR 1347–51. Dr. Keehn noted that Plaintiff lived by herself and was able to manage her own money, perform household chores, shop, and cook. AR 1349. He assessed a Global Assessment of Functioning ("GAF") score of 65.[3] AR 1350. After observing Plaintiff interact with his staff and perform several standard tests, Dr. Keehn concluded that she had only "mild difficulties" maintaining focus, attention, concentration, persistence, and pace. AR 1350–51. He also found she would have only "mild difficulties" completing a normal workday or workweek. AR 1351.

Two state agency consultants also considered Plaintiff's mental RFC. In July 2017, M. D. Morgan, M.D., opined that Plaintiff was "not significantly limited" in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. AR 78–79. After reviewing the Findings of Fact and Analysis of Evidence ("FOFAE") (AR 73–75), Dr. Morgan concluded that Plaintiff was, however, "moderately limited" in her ability to "complete a normal workday and workweek without interruptions from psychologically based

---

[3] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (hereinafter DSM–IV). According to DSM–IV, a GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within household), but "generally functioning well, has some meaningful interpersonal relationships." Id. 34. Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." Garrison v. Colvin, 759 F.3d 995, 1003 n.4 (9th Cir. 2014).

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." AR 79. Dr. Morgan also opined that Plaintiff was capable of skilled work with limited public contact. AR 81–82.

On reconsideration in September 2017, Michael D'Adamo, Ph.D., found Plaintiff "moderately" limited in both categories mentioned above. AR 94–95. Dr. D'Adamo explained, "Mood and anxiety symptoms limit her to tasks which do not require sustained focusing or complex attention. In the context of simple tasks which complete easily she can maintain CPP [concentration, persistence, and pace]." AR 95. Dr. D'Adamo limited Plaintiff to unskilled work. AR 97.

The ALJ gave "great weight" to the opinions of Drs. Morgan and D'Adamo. AR 26. The ALJ gave "some weight" to Dr. Keehn's opinion, because "it is consistent with conservative treatment and lack of hospitalization, but some additional limitations are warranted to accommodate [Plaintiff's] subjective complaints." AR 24.

Plaintiff argues that the ALJ erred by failing either to incorporate these doctors' opinions concerning Plaintiff's difficulties performing within a schedule and completing a normal workday or workweek or give specific, legitimate reasons for rejecting those opinions. (JS at 5–6, 10.)

Plaintiff fails to demonstrate legal error. Dr. D'Adamo, whose opinions were more restrictive than those of either Drs. Morgan or Keehn, clearly explained his view that Plaintiff could maintain concentration, persistence, and pace sufficiently to sustain employment if limited to simple work (AR 95), and the ALJ limited Plaintiff's RFC to simple, repetitive, routine tasks (AR 21). Indeed, all three Alternative Jobs require only reasoning level 1, the lowest reasoning requirement in the DOT. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1002 (9th Cir. 2015) ("There are six GED Reasoning Levels that range from Level One (simplest) to Level Six (most complex)."). Level 1 reasoning requires workers to "[a]pply commonsense understanding to carry out simple one- or two-step instructions [and]

[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT, App. C, 1991 WL 688702.

Plaintiff appears to argue that an opinion of mild or moderate limitation in the area of attendance or persistence requires some accommodation in her RFC, like an allowance to be off-task some percentage of the workday, although Plaintiff does not explain how she would translate such opinions into RFC restrictions. (JS at 10–11.) Plaintiff fails to address the multiple cases holding that mild or moderate limitations in such areas of mental functioning are sufficiently accommodated by limiting a claimant to simple, repetitive, routine tasks. See, e.g., Shaibi v. Berryhill, 883 F.3d 1102, 1107 (9th Cir. 2017) (finding "no obvious inconsistency" between physician's opinion that the claimant was "moderately limited" in his interactions with coworkers and the ALJ's RFC finding that limited plaintiff to "simple routine tasks in a non-public setting, with occasional interactions with coworkers"); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173 (9th Cir. 2008) (finding limitation to "simple, routine, repetitive" work sufficiently accommodated medical opinion evidence that plaintiff had "moderate" limitation in pace and "other mental limitations regarding attention, concentration, and adaptation"); Hector T. v. Saul, No. CV 19-9797 PVC, 2021 WL 1163162, at *10 n.8, 2021 U.S. Dist. LEXIS 58419, at *28 n.8 (C.D. Cal. Mar. 26, 2021) ("[T]he ALJ accounted for the moderate mental limitations [the physician] opined by limiting [the claimant's] RFC to simple, unskilled tasks with no more than minimal change in tasks and no more than occasional brief intermittent work with coworkers, supervisors, and the public."); McLain v. Astrue, No. SACV 10-1108 JC, 2011 WL 2174895, at *6, 2011 U.S. Dist. LEXIS 60496, at *18–19 (C.D. Cal. June 3, 2011) ("Moderate mental functional limitations—specifically limitations in social functioning and adaptation—are not *per se* disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks."); Rogers v. Comm'r of Soc. Sec., No. 09-CV-01972, 2011 WL 445047, at *11–12, 2011 U.S. Dist. LEXIS 13741, at *33–34

(E.D. Cal. Jan. 25, 2011) (finding that RFC assessment that limits a claimant to simple, repetitive tasks adequately accounts for moderate limitations in social functioning), aff'd sub nom. Rogers v. Comm'r of Soc. Sec. Admin., 490 F. App'x 15 (9th Cir. 2012); see also Koehler v. Astrue, 283 F. App'x 443, 445 (9th Cir. 2008) (finding that claimant lacked a "severe" mental impairment was proper even though claimant had "moderate" limitation in the "ability to respond to changes in the workplace setting").

### 2. Sub-Issue 1(b): Dr. Sanford.

Dr. Sanford initially evaluated Plaintiff in July 2017. AR 1454. After performing a physical examination, he concluded that the only work restriction warranted was "ready access to a clean restroom." AR 1458. In September 2017, he authored a follow-up report. AR 1462. At that time, his observations of Plaintiff's physical condition were "essentially unchanged." AR 1463. He wrote a second follow-up report in November 2017. AR 1465. Again, his assessment of Plaintiff's physical condition was "unchanged." AR 1466. This time, however, he added a new work restriction, restricting Plaintiff to "only … sedentary work."[4] AR 1467. The ALJ gave Dr. Sanford's opinions "some weight," explaining that she would "adopt the limitation regarding access to restroom. However, the opinion of sedentary work is not warranted based on otherwise normal physical examination." AR 24.

Plaintiff argues that the ALJ failed to give a specific, legitimate reason for rejecting Dr. Sanford's restriction to sedentary work, because it was not intended to

---

[4] In the context of California workers' compensation law, "sedentary" work means "the individual can do work predominantly in a sitting position at a bench, desk or table with a minimum of demands for physical effort and with some degree of walking and standing being permitted." State of California, Dep't of Indus. Relations, Div. of Workers' Comp., Schedule for Rating Permanent Disabilities 2-19 (Apr. 1997), available at <https://www.dir.ca.gov/dwc/pdr1997.pdf> (last viewed May 27, 2021).

7

address pain from a musculoskeletal impairment, such that it is not inconsistent with an otherwise normal physical examination. Rather, Plaintiff argues that Dr. Sanford restricted her to sedentary work to address her urinary incontinence. (JS at 7– 8) ("Plaintiff's incontinence would simply be made worse and aggravated if she were to strain to perform work activity at levels greater than sedentary.").

First, Plaintiff fails to explain how any error in the ALJ's evaluation of Dr. Sanford's opinion would be prejudicial, because the table worker Alternative Job is sedentary (DOT 739.687-182), and the VE testified that 25,000 such jobs exist in the national economy. AR 59; see Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 528–29 (9th Cir. 2014) (holding that 25,000 jobs is a significant number of jobs in the national economy); see also Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error is harmless if "inconsequential to the ultimate nondisability determination").

Second, Plaintiff fails to develop this argument. Plaintiff points to nothing in Dr. Sanford's reports that explains why he imposed the sedentary restriction. Plaintiff points to no other evidence, either from a medical source or Plaintiff's own testimony, that tends to show Plaintiff's incontinence was worse when she was standing or walking.[5] The ALJ correctly concluded that Dr. Sanford's restriction to sedentary work has no obvious support in his own treating records, and ALJs may discount treating physician opinions that lack support. Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (incongruity between treating physician's opinion and his treating records is a specific and legitimate reason for rejecting physician's opinion); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ "need not

---

[5] In February 2019, Plaintiff reported walking for 30 minutes about three times per week. AR 1525. At the hearing in July 2019, she testified that 30 minutes was the longest she could walk before getting too tired to continue without mentioning incontinence as a limitation on walking. AR 48.

8

accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings").

### 3. Sub-Issue 1(c): Handling/Fingering Restrictions.

In November 2013, Plaintiff complained to Kaiser of hand pain affecting her "right hand up to the elbow x 5 months." AR 528. At that time, she was still working "in an office setting" and exercising in the evenings "120 minutes per week at a moderate to strenuous level." AR 528–29. Her right wrist was tender to palpation, but she had a "good range of motion." AR 530. She was diagnosed with tenosynovitis and counseled to do "range of motion exercises, ice as needed" and wear a wrist brace. AR 531. From this, Plaintiff argues that her RFC should have accommodated her tenosynovitis, presumably by restricting the use of her right hand and wrist. (JS at 10.)

Plaintiff fails to cite any medical evidence after her alleged disability onset date discussing wrist pain. Plaintiff fails to identify any medical source who opined that Plaintiff had functional limitations affecting her right hand and wrist. Again, Plaintiff fails to demonstrate legal error.

### 4. Sub-Issue 1(d): Time Off-Task for Bathroom Breaks.

Plaintiff argues that the ALJ erred by failing to find that she will need to take unscheduled bathroom breaks with a frequency and duration that precludes employment. (JS at 9–10.)

a. Summary of Relevant Evidence.

Plaintiff fails to cite any medical records discussing how frequently she must use the bathroom or how long she must typically spend in the bathroom. The Court was unable to find any medical source who opined that Plaintiff could work only if given bathroom break time exceeding the time normally tolerated in the workplace. A chronological summary of records discussing Plaintiff's incontinence is as follows:

- January 2015: Plaintiff reported numerous anxiety-related physical symptoms that she attributed to her unkind ex-supervisor, but not incontinence. AR 3202, 3207. She was able to drive, use a computer, maintain a romantic relationship, and visit family. AR 3203, 3209.
- June 2015: Plaintiff reported "gastrointestinal disturbances subsequent to her exposure to the stressful work environment," but not incontinence. AR 374.
- October 2015: Internist Michael Rudolph, M.D., recommended that Plaintiff "start taking Metamucil three times a day" to treat diarrhea. AR 1473.
- January 2017: Mark M. Davidson, M.D., prepared a qualified medical evaluator's ("QME") report for Plaintiff's workers' compensation case. AR 1249. Plaintiff told Dr. Davidson that she experienced diarrhea two or three times weekly. AR 1251. She reported urinary and bowel incontinence. AR 1251. Her fecal incontinence had started in April 2016, while her urinary incontinence had started in 2014. AR 1252. She acknowledged that Metamucil had been recommended, but she did not take it. AR 1252. Her incontinence symptoms had worsened "to the point that she wears a diaper when she leaves the house …." AR 1252. Despite these difficulties, she could still conduct normal activities of daily living. AR 1255. She was not taking any medication for gastrointestinal complaints. AR 1263. Dr. Davidson determined that she had IBS and GERD. AR 1262. He concluded that Plaintiff had not had a period of temporary total disability due to her gastrointestinal disorders. AR 1266. As a work restriction, he opined only that she should be restricted against "undue or extreme stress." AR 1267. He did not impose any restrictions related to the frequency or duration of allowed bathroom breaks.
- January 2017: Psychiatrist Gennady Musher, M.D., Ph.D., completed a "Final Psychiatric Evaluation and Report." AR 319–30. He noted the physical symptoms Plaintiff originally reported in 2016, which did not include incontinence. AR 321. Plaintiff reported "no significant changes in her physical health" since

December 2016.  AR 323.  Dr. Musher summarized the symptoms she was experiencing in 2017, which included some physical complaints like muscle tension and sleep disturbance, but they did not include incontinence.  AR 328.

- <u>May 2017</u>: Plaintiff reported, "I am unable to control my urine and bowel movements."  AR 241.  She further reported, "I usually don't make it to the toilet in time when I urinate, and 2–3 times a week I defecate on my diaper."  AR 242.  She was taking Nortriptyline to treat IBS.  AR 248.
- <u>June 2017</u>: Plaintiff told Dr. Keehn that she experienced anxiety-related incontinence.  AR 1348.
- <u>July 2017</u>: Plaintiff told QME Dara Saghafi, M.D., that taking Nortriptyline had improved her IBS-related diarrhea and she had "much less accidents."[6]  AR 1358.  While she used to have episodes two or three times weekly, it had improved to "once a week or less."  AR 1358.  She also reported that she "frequently urinates at nighttime."  AR 1360; <u>see also</u> AR 1550 (Nortriptyline improvement of diarrhea continued in September 2017).
- <u>July 2017</u>: Plaintiff saw Dr. Sanford for a urological consultation.  AR 1454.  Plaintiff's chief complaint was "urinary urgency and urge incontinence."  AR 1455.  Since starting medication for IBS, her fecal incontinence had improved and only occurs three to four times a month.  AR 1455.  Her urinary symptoms worsened with stress, and she required three to five diapers per day.  AR 1455.  She was "asked to fill out a 24-hour voiding diary."  AR 1458.  Dr. Sanford recommended Kegel exercises.  AR 1458.
- <u>September 2017</u>: When Plaintiff returned for a follow-up appointment with Dr. Sanford, she did not bring her voiding diary and reported that she had not done

---

[6] In May 2017, Plaintiff reported to the SSA that Nortriptyline had side effects including "constipation, blurred vision, muscle stiffness, [and] nightmares," but in July 2017, Plaintiff told Dr. Saghafi that she was experiencing no side effects from Nortriptyline.  <u>Compare</u> AR 248, <u>with</u> AR 1359.

11

any Kegel exercises.[7] AR 1462. Her symptoms had worsened, and she changed her diapers five to six times per day. AR 1462. She was not seeing a psychologist on a regular basis. AR 1463. She scheduled a nerve stimulation treatment to address urinary incontinence. AR 1463.

- <u>November 2017</u>: Plaintiff told Dr. Sanford that she wanted to discontinue the nerve stimulation treatment after one session, because it did not help and the drive to the doctor's office was too stressful; she was still using five diapers daily. AR 1465–66. She had started seeing a psychologist, but she was not taking anti-depressant or anti-anxiety medication. AR 1466. Dr. Sanford recommended surgical intervention to address her urinary incontinence, which Plaintiff declined. AR 1467, 1501.

- <u>May 2018</u>: Dr. Davidson wrote another QME report. AR 1499. Plaintiff reported diarrhea "4 times a day 2 to 3 times a week," but she did not have bowel movements every day. AR 1501. She took Pepto Bismol which was "effective in controlling her bowel habits however she gets nauseated with it." AR 1501. Dr. Davidson continued to recommend avoiding "undue or extreme stress" as the only work restriction. AR 1515.

- <u>February 2019</u>: Plaintiff told Dr. Saghafi that Floranex twice a day "helps her diarrhea and IBS 'so much.' About 60% of her bowel movements are now normal" and her "bouts of diarrhea … are overall significantly improved." AR 1524; <u>see also</u> AR 1547 (IBS symptoms continued improving in April 2019). She reported using three to four pads a day for urinary incontinence and "is happy about them." AR 1525.

- <u>March 2019</u>: Plaintiff told Kaiser that she was "not interested in any medications for anxiety and depression." AR 2665.

---

[7] No party cited voiding diary records in the AR, and the Court saw none.

• <u>April 2019</u>: Plaintiff started treatment with a new therapist at Kaiser. Her subjective complaints did not include anxiety-related incontinence. AR 2772–73.

At the hearing in July 2019, Plaintiff testified that she could not predict when she would need to use the bathroom and still had "a lot of accidents." AR 44. She testified that she had daily issues with bowel and bladder incontinence that had worsened since 2014. AR 45–46. When she felt the need to go to the bathroom, she needed to go immediately, but she still had accidents "all the time." AR 46. She reported using five or six undergarments per day. AR 46. On some days, she used the bathroom 10 or 15 times. AR 47. She believed there was "most definitely" a relationship between her incontinence and anxiety. AR 47. She felt her symptoms were worse due to the financial stress of not working. AR 52.

In all the medical records, the parties did not cite and the Court did not find any medical source who indicated that Plaintiff needed to take an urgent bathroom break during her appointment, although some appointments lasted one to two hours.

        b.        Summary of Relevant Administrative Proceedings.

The VE testified that if a hypothetical worker were off-task 15% of the time, that would preclude employment. AR 60. Similarly, showing up 15 or 30 minutes late four to five times per month would preclude employment. AR 61. If a worker needed to take unscheduled breaks that totaled 4 hours per week (or about 10% of a 40-hour workweek), that would also preclude employment. AR 61. Regarding bathroom breaks, the VE testified that a hypothetical worker doing the Alternative Jobs could take hourly, unscheduled breaks, but they would need to be limited to about six minutes. AR 62. If bathroom break time reached 15 minutes every 1.5 hours (i.e., about 17% of work time), then that would preclude employment. AR 63.

The ALJ found that Plaintiff had the RFC to work so long as she had "ready access" to a bathroom. AR 21. Thus, the ALJ implicitly found that the time required for Plaintiff's bathroom breaks would not exceed the work-preclusive

13

limits established by the VE's testimony.  Plaintiff now argues that the ALJ's finding lacks substantial evidentiary support.  (JS at 10, 12–13.)

          c.       The ALJ's RFC Is Supported by Substantial Evidence.

In the social security disability benefits context, a normal workday contemplates a morning, lunch, and afternoon break.  Learnaham v. Astrue, No. 2:09-cv-01143, 2010 U.S. Dist. LEXIS 93121, at *18–19, 2010 WL 3504936, at *5 (E.D. Cal. Sep. 1, 2010); see SSR 96-9p, 1996 WL 374185, at *6, 1996 SSR LEXIS 6, at *17 (noting that a normal workday contemplates "a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals"); see also Programs Operations Manual System ("POMS") DI 24510.005(C)(2)(b) ("Consider an 8-hour workday and a 5 day work week (with normal breaks, e.g., lunch, morning and afternoon breaks) in evaluating the ability to sustain work-related functions.").  A worker can use the bathroom during any of these breaks, as well as before and after work, without being off-task during working hours.  As a result, one cannot simply compare the total estimated time required for daily bathroom breaks to an eight-hour workday to see if it would exceed 15%.

In her briefing, Plaintiff does not attempt to perform this kind of calculation or any other to support her argument.  Instead, she summarily argues that she will be off-task, late, or absent more than the VE allowed.  (JS at 10, 22–23.)

A review of the medical records summarized above, however, demonstrates that the ALJ had reasons to conclude Plaintiff was exaggerating the severity of the functional limitations caused by her incontinence.  Over the years between 2015 and 2017 during which she purportedly experienced worsening symptoms of IBS and fecal incontinence, she declined to try an over-the-counter remedy like Metamucil.  AR 1252, 1473.  When she did take medication, her IBS symptoms improved to the point where she only experienced diarrhea once a week.  AR 1358, 1455, 1501, 1524.  This suggests that her diarrhea and fecal incontinence were not as disabling during this period as she alleges.

Plaintiff did not start to complain of anxiety-related urinary incontinence until years after she stopped working. AR 1251. While she attributed her urinary incontinence to anxiety, she was often neither enrolled in counselling nor taking medication to address her anxiety. AR 1463, 1466, 2665. Despite Dr. Sanford's recommendations, she did not submit a voiding diary or do Kegel exercises. AR 1462. Dr. Sanford declined to find Plaintiff disabled from a urological perspective for purposes of workers' compensation law. AR 1458, By February 2019, she was wearing three to four pads daily to protect against leaks from urinary incontinence, and she told Dr. Saghafi that she was "happy" with that solution. AR 1525. This is not consistent with someone who is disabled by urinary incontinence.

But even starting with Plaintiff's testimony that some days she needed to use the bathroom 10 to 15 times (AR 47), and assuming that she can use the bathroom before and after work, during her morning and afternoon breaks, and twice during her lunch hour, then she would need to use the bathroom about four to nine times during working hours. This is roughly once per each of the eight hours in a typical workday, which the VE testified would not preclude work, so long as each bathroom break did not exceed six minutes. AR 62.

Plaintiff has not provided evidence of the average length of her bathroom breaks. Plaintiff identifies no evidence that lengthy bathroom visits are typical for her or that occasional longer visits, perhaps after a fecal accident, could not often be accomplished during nonworking hours. See Taylor v. Astrue, No. C12-1069, 2013 U.S. Dist. LEXIS 22311, at *12–13, 2013 WL 607436, at *4 (W.D. Wash. Jan. 28, 2013) (finding no reversible error where claimant failed to present evidence of functional limitations, i.e., the need for frequent bathroom breaks, caused by his Crohn's disease).

Again, by finding that Plaintiff could work if she had "ready access" to a bathroom, the ALJ implicitly found that Plaintiff would not require bathroom breaks of frequency or duration beyond the limits established by the VE's

15

testimony. Plaintiff has failed to demonstrate that this finding lacks substantial evidentiary support.

### 5. Sub-Issue 1(e): Ready Bathroom Access.

Dr. Sanford restricted Plaintiff to work with "ready access to a clean restroom." AR 1458, 1467. The ALJ used Dr. Sanford's wording but attempted to quantify "ready access" by stating, "Must have ready access to a bathroom, meaning that a bathroom must be within a few minutes' walk." AR 21. Plaintiff argues that this does not adequately accommodate her incontinence. (JS at 9–10.)

Plaintiff does not suggest an alternative meaning for "ready access." The ALJ included in the hypothetical posed to the VE the requirement that the worker "have ready access to a bathroom meaning that the bathroom must be within a few minutes' walk." AR 59. Plaintiff's counsel could have asked the VE what she understood "a few minutes' walk" to mean, the amount of time required to walk to the bathroom at most job sites, and if employers with more remote bathrooms typically allow bathroom breaks to exceed six minutes. While Plaintiff's counsel actively probed the VE, he did not ask any of these questions. AR 60–63. Now, Plaintiff makes a conclusory argument that this restriction "simply fails to contemplate the combination of this Plaintiff's physical impairments and symptoms" without explaining how so. (JS at 10.) If Plaintiff is arguing that "ready access" means less than a "few minutes' walk," she provides no evidence that Dr. Sanford found her incontinence that limiting.[8] Thus, Plaintiff has failed to demonstrate legal error.

---

[8] In other cases, VEs have testified that while "ready access" to a bathroom means that the bathroom is located within "a reasonable walking distance, [f]or example, 30 to 60 seconds," "most jobs have this type of bathroom access." E.g., Martha W. v. Comm'r, Soc. Sec. Admin., No. 6:19-CV-01251, 2020 WL 7047308, at *6, 2020 U.S. Dist. LEXIS 223726, at *18 (D. Or. Nov. 29, 2020).

16

|   |   |
|---|---|
| 1 | **6. Sub-Issue 1(f): Exertional Restrictions.** |
| 2 | Plaintiff argues that the ALJ erred by failing to include any exertional |
| 3 | restrictions in her RFC. (JS at 9.) This is only harmful error if Plaintiff had |
| 4 | exertional limitations that would preclude her from doing the Alternative Jobs. As |
| 5 | discussed above, the DOT rates the table worker job as sedentary. AR 28, 59 (DOT |
| 6 | 739.687-182.) Plaintiff points to no evidence suggesting that she cannot do the |
| 7 | exertional demands of sedentary work. Again, Plaintiff has failed to demonstrate |
| 8 | error. |
| 9 | **B. ISSUE TWO(a): Plaintiff's Subjective Testimony.** |
| 10 | Plaintiff argues that the ALJ "failed to cite anything other than her perception |
| 11 | that the subjective statements and testimony are not supported by the objective |
| 12 | evidence as justification for rejecting" Plaintiff's testimony. (JS at 19.) Not so. |
| 13 | The ALJ partially discounted Plaintiff's subjective symptom testimony for multiple |
| 14 | other reasons.[9] |
| 15 | First, the ALJ found Plaintiff's testimony inconsistent with her activities. |
| 16 | AR 25. The ALJ contrasted Plaintiff's testimony that she mostly stayed home (AR |
| 17 | 44) with medical records showing that she traveled regularly to Northern California |
| 18 | to visit her boyfriend and engaged in other travel.[10] AR 25, citing AR 1028 |
| 19 | (October 2016 record stating that Plaintiff's boyfriend "now lives in No CA while |
| 20 | [Plaintiff] lives here and they alternate trips every other week for visits") and AR |
| 21 | 1682 (September 2017 record stating that Plaintiff "is going out of town for a while |

---

[9] The ALJ did not completely discount Plaintiff's subjective symptom testimony. While the ALJ gave Dr. Keehn's opinion "some weight," the ALJ concluded that "some additional limitations are warranted to accommodate [Plaintiff's] subjective complaints." AR 24.

[10] Plaintiff suggests there is no inconsistency because the ALJ did not question Plaintiff about these trips and give her an opportunity to explain. (JS at 19.) The trips are documented in Plaintiff's medical records which are substantial evidence. AR 1028, 1682.

this Sunday"). The ALJ also cited psychological evaluations in 2015 and 2016 during which Plaintiff reported relatively normal activities of daily living. AR 23, 25, citing AR 1349 (Plaintiff could live by herself, do household chores, run errands, shop, cook, manage her own money, care for pet cats, and pursue coloring as a hobby), AR 3203 (Plaintiff could drive, run errands, cook, clean, shop, dine out, and visit with family) and AR 323 (Plaintiff could drive, run errands, cook, clean, shop, eat out twice per month, use a computer, care for her cats, spend time with her boyfriend, and visit her adult son and parents).

Second, the ALJ noted that Plaintiff had declined various forms of recommended treatment for her mental and physical impairments. AR 24–25. Despite claiming disabling anxiety (AR 39, 47 [hearing]), Plaintiff had long gaps without mental health counselling (AR 1595–3200, 3342–76) and was not taking or expressed disinterest in anti-anxiety medication (AR 1463, 1466, 2665) and other forms of treatment, despite improving when she did obtain treatment. See AR 1135 (December 2013 Kaiser record describing Plaintiff's "ongoing work concerns" and "sense of being singled out or otherwise picked on," but she "did not keep psychotherapy appointment, seems to feel no need for such"); AR 328 (December 2016 workers' compensation record stating that Plaintiff reported her "symptoms of depression and anxiety have significantly subsided" since March 2016 after receiving "a course of mental health treatment"); AR 2133–34 (March 2018 Kaiser 9:30 a.m. record declining 2:00 p.m. mental health appointment because "Kaiser never helps her and it takes too long for her to get help"); AR 2761 (March 2019 Kaiser record stating that Plaintiff "declined to schedule IOP [intensive outpatient psychiatric services] until her schedule cleared up"). Plaintiff discontinued therapy that might have helped her urinary incontinence after one session, claiming that the drive was too stressful (AR 1465–66) and she also declined surgical intervention (AR 1467, 1501).

Thus, the ALJ gave at least two other clear and convincing reasons, both supported by substantial evidence, for partially discounting Plaintiff's subjective symptom testimony.

C. **ISSUE TWO(b): Plaintiff's Mother's Subjective Statements.**

On May 4, 2017, Plaintiff's Mother R. G. completed a third-party function report. AR 227–34. R. G. reported that Plaintiff was "basically a shut in" due to her "severe anxiety." AR 227. She observed that Plaintiff "had no social life," was stressed out even by being with family members, and "prefers to keep to herself and stay home" such that R. G. needed to check on her weekly and bring her food. AR 232.

The ALJ summarized these statements. AR 26. The ALJ then contrasted it with Plaintiff's statements to medical sources about her social life and ability to live independently. AR 26. The ALJ cited records in which Plaintiff reported she could drive, shop, cook, and perform household chores. AR 26, citing AR 323, 1349. The ALJ also cited records describing Plaintiff's travel every other week to visit her boyfriend. AR 1028, 1034 (couples counselling record noting that Plaintiff and her boyfriend had been in a relationship for more than four years).

An ALJ can reject lay witness testimony for a germane reason supported by substantial evidence. Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) ("When an ALJ discounts the testimony of lay witnesses, he or she must give reasons that are germane to each witness.") (citation omitted). Here, the inconsistency between R. G.'s description of Plaintiff's functional limitations and Plaintiff's actual activities, as reported by Plaintiff and observed by treating medical sources, provides such a reason. See Molina v. Astrue, 674 F.3d 1104, 1122 (9th Cir. 2012) (because "the lay testimony described the same limitations as Molina's own testimony, … the ALJ's reasons for rejecting Molina's testimony apply with equal force to the lay testimony"); Valentine, 574 F.3d at 694 ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting

19

Valentine's own subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony.").

IV.

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner shall be AFFIRMED. Judgment shall be entered consistent with this order.

DATED: June 3, 2021

_____
KAREN E. SCOTT
United States Magistrate Judge